**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MY PHILLY LAWYER,<br>1500 John F. Kennedy Boulevard, Suite 1410<br>Philadelphia, PA 19102<br>*Individually and on Behalf of All Others*<br>*Similarly Situated,*<br><br>       **Plaintiff,**<br><br>  **v.**<br><br>SINCLAIR BROADCAST GROUP, INC.<br>10706 Beaver Dam Road<br>Hunt Valley, MD 21030<br>Baltimore County;<br><br>TRIBUNE MEDIA COMPANY<br>515 North State Street<br>Chicago, IL 60654;<br><br>TRIBUNE BROADCASTING COMPANY,<br>LLC<br>435 N. Michigan Avenue<br>Chicago, IL 60611;<br><br>and DOES 1-20,<br><br>       **Defendants.** | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, My Philly Lawyer, individually and on behalf of all others similarly situated, brings this class action against Defendants Tribune Media Company, Tribune Broadcasting Company, LLC, (together, "Tribune") and Sinclair Broadcast Group, Inc. ("Sinclair") (collectively, with Tribune, "Defendants") for damages, injunctive relief and other relief for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Complaint is based upon personal knowledge with respect to Plaintiff's own acts and upon information and belief, formed after reasonable inquiry, including the investigation of counsel.

## INTRODUCTION AND OVERVIEW

1.      This lawsuit arises out of a contract, combination and conspiracy among Defendants and their co-conspirators to fix, raise, stabilize, and maintain prices for commercials to be aired on broadcast television stations throughout the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by sharing competitively sensitive information through their advertising sales teams. Defendants' and their co-conspirators' unlawful collusion led to supracompetitive prices in the market for the sale of television advertising. Defendants have significant market penetration for advertising in the United States. As the largest owner of broadcast television stations in the United States, Sinclair is one of the most powerful media companies in the country. It owns, operates, and/or provides services to 192 stations in 89 cities, which broadcast 611 channels. Tribune owns 43 local broadcast television stations in approximately 35 cities like Los Angeles, New York and Chicago. Together, advertising on Defendants' stations reaches over 80 percent of U.S. households.

2.      In recent years, Defendants and other broadcast television companies have experienced significant slowing in revenue growth, due to, inter alia, increased competition for advertising dollars from companies like Google and Facebook.

3.      One response to this reduction in revenue growth has been to seek to achieve economies of scale and expand respective customer bases via mergers with and acquisitions of other broadcast television companies.

4.      However, under the National TV Ownership rule adopted by the Federal Communications Commission ("FCC"), Defendants and other broadcast television companies are prohibited from individually owning a group of broadcast television stations that enables them to reach more than 39 percent of all U.S. television households. Thus, Defendants and other broadcast television companies have had trouble sufficiently increasing revenues solely via mergers and acquisitions.

5.      Sinclair announced its intention to acquire Tribune over a year ago, but the acquisition has stalled due, at least in part, to the FCC's concerns regarding Sinclair's ability to comply with the National TV Ownership rule.

6.      Accordingly, since at least January 1, 2014, Defendants and their co-conspirators responded to decreased television advertising spending in another way—by colluding on pricing for television advertising, which allows them to artificially inflate such pricing above competitive levels.

7.      The goal of Defendants' scheme was to charge supracompetitive prices for television advertising. Given the market share of each Defendant (approximately 40 percent), neither Defendant could have accomplished this goal on its own without risking losing customers. Nevertheless, in a market where Defendants jointly reach over 80 percent of U.S. households, Defendants were able to collude to fix, raise, maintain, stabilize, or artificially inflate prices for television advertising with no negative repercussions.

8.     Defendants effectuated their scheme by having members of their advertising sales teams share competitively sensitive and proprietary information and data with each other, which they used to coordinate efforts and artificially inflate advertising prices to levels higher than they otherwise would have been absent the collusion.

9.     Defendants and their co-conspirators had numerous opportunities to conspire, including through merger negotiations and at conferences and meetings held by industry associations such as the Television Bureau of Advertising, Inc. ("TVB") and the National Association of Broadcasters ("NAB").

10.     On July 26, 2018, *The Wall Street Journal* reported that the United States Department of Justice ("DOJ") was investigating Defendants and unnamed co-conspirators for antitrust violations relating to price-fixing in the market for the sale of television advertising. The reports indicated that the DOJ uncovered evidence of Defendants' collusive behavior while reviewing the implications of Sinclair's nearly $4 billion proposed acquisition of Tribune.

11.     Several additional media outlets reported that the DOJ was investigating whether Defendants and their co-conspirators violated antitrust laws by coordinating "efforts when their ad sales teams spoke with one another about performance—conversations that might have led to higher ad rates for TV commercials . . . ."

12.     As a result of Defendants' collusion, Plaintiff and all other direct purchasers of advertisement time on broadcast television stations provided by Defendants suffered and continue to suffer injuries caused by Defendants stifling competition and inflating, fixing, raising, stabilizing, or maintaining prices for television advertising in the United States, which were higher than prices that would have been established in a competitive market.

13.     The impact of Defendants' unlawful and anticompetitive conduct is ongoing and continues to this day and requires injunctive relief to prevent future harm to Plaintiff and members of the Class.

14.     Until the publication of reports regarding the DOJ investigation on July 26, 2018, Defendants fraudulently concealed their unlawful conduct from Plaintiff and members of the Class, and Plaintiff and members of the Class had no way of knowing that the advertising rates they were paying were the result of unlawful collusion.

15.     Plaintiff seeks to represent a Class consisting of all persons and entities in the United States who paid for all or a portion of advertisement time on broadcast television stations provided by Defendants from at least January 1, 2014 until the effects of their unlawful conduct cease (the "Class Period").

16.     Plaintiff and members of the Class seek injunctive relief and damages for their injuries caused by Defendants' collusive, manipulative, and anticompetitive restraint of competition in the market for television advertising in the United States. Specifically, Plaintiff seeks injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees on behalf of itself and the Class, as defined herein, pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

## CLASS ALLEGATIONS

17.     Plaintiff brings this proposed action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and 23(b)(2), and/or (b)(3) on behalf of itself and as a class action, seeking injunctive relief and damages on behalf of the following nationwide class of those similarly situated:

> All persons and entities in the United States who paid for all or a portion of the cost of advertisement time directly to Defendants, or any current or former subsidiary or affiliate of Defendants, or any co-conspirator, during the period from at least and including January 1, 2014 until the effects of Defendants' unlawful conduct ceases. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, agents, co-conspirators, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

18.     Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to add Sub-Classes if and where appropriate.

19.     Given Defendants' substantial nationwide presence, the Class is so numerous that individual joinder of all potential members is impracticable. Plaintiff believes that at least thousands of individuals or entities in the United States purchased at least a portion of the cost of television advertisement time directly from one or more Defendants during the Class Period.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any issues solely affecting individual members of the Class. The common and predominating questions of law and fact include, but are not limited to:

a.      Whether Defendants' conduct is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.      Whether Defendants unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.      Whether Defendants engaged in a price-fixing conspiracy among horizontal competitors in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

d.      Whether Defendants engaged in a combination, conspiracy, and/or agreement to stifle competition in the market for the sale of television advertising in the United States; Whether

Defendants engaged in a combination, conspiracy, and/or agreement to raise, fix, maintain, stabilize, and/or inflate prices in the market for the sale of television advertising in the United States;

e.        The identity of the participants in the conspiracy;

f.        The duration of the conspiracy;

g.        The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

h.        Whether the conduct of the Defendants, as alleged herein, caused injury to the business or property of Plaintiff and members of the Class;

i.        Whether the conduct of the Defendants, as alleged herein, reduced price competition in the market for the sale of television advertising in the United States and caused television advertising to be sold at artificially inflated prices;

j.        Whether Plaintiff and other members of the Class are entitled to injunctive relief and, if so, the nature and extent of such relief;

k.        Whether equitable relief should be awarded; and

l.        Whether actual damages, costs, disgorgement, and/or treble damages should be awarded.

21.        Plaintiff's claims are typical of the claims of the members of the Class because they were all damaged by the actions of Defendants, which caused them to pay artificially inflated prices for television advertising.

22.        Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or in conflict with the interests of the other

members of the Class.

23.     Plaintiff's interests are co-extensive with and are not antagonistic to those of absent Class members. Plaintiff will undertake to represent and protect the interests of absent Class members and will vigorously prosecute this action.

24.     Plaintiff has engaged the services of the undersigned counsel, who are experienced in class action and antitrust litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and absent Class members.

25.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

26.     Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Class members.

27.     The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class.

28.     The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical. The Class has a high degree of similarity and is cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

## JURISDICTION AND VENUE

29.     Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such

other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

30.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Section 16 of the Clayton Act, 15 U.S.C. § 26, to award equitable and injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) to award damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

31.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants are believed to have resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to the claims occurred within this District, and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District. Additionally, Defendant Sinclair is headquartered in this District, in Hunt Valley, Maryland.

32.     This Court has personal jurisdiction over each Defendant because each Defendant is believed to have transacted business throughout the United States, including in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States, including in this District. In addition, Defendants' conspiracy was directed at, and had the intended effect of causing injury to persons residing in, located in, or doing business in the United States, including in this District, and Plaintiff's claims arise out of Defendants' conduct.

33.     Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

## PARTIES

34.     Plaintiff My Philly Lawyer is a law firm located in Philadelphia, Pennsylvania and purchased television advertising from one or more of the Defendants during the Class Period. As a result of Defendants' and their co-conspirators' collusive and anticompetitive conduct, Plaintiff has paid artificially inflated prices for television advertising and has been injured in its business or property.

35.     Defendant Sinclair Broadcast Group, Inc., a Maryland corporation, is a diversified television broadcasting company headquartered in Hunt Valley, Maryland.

36.     Defendant Tribune Media Company, a Delaware corporation, is a diversified media and entertainment business headquartered in Chicago, Illinois.

37.     Defendant Tribune Broadcasting Company, LLC, a Delaware limited liability company, is a television broadcasting company headquartered in Chicago, Illinois that operates as a subsidiary of Tribune Media Company.

38.     Together, Tribune Media Company and Tribune Broadcasting Company LLC are referred to herein as "Tribune."

39.     Does 1-20 are other television broadcast companies and their predecessors, successors, subsidiaries, corporate officers, members of the boards of directors, or senior officials, or predecessors, successors, subsidiaries, corporate officers, members of the boards of directors, or senior officials of Defendants. Plaintiff alleges on information and belief that Does 1-20, inclusive, were coconspirators with Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof. Plaintiff is presently unaware of the true names and identities of those defendants sued herein as Does 1-20. Plaintiff will amend this Complaint to allege the true names of the Doe defendants when it is able to ascertain them.

40. Various other persons and/or firms not named as defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

41. Each Defendant and their respective subsidiaries acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## INTERSTATE TRADE AND COMMERCE

42. Billions of dollars of transactions in television advertisements are entered into each year in interstate commerce in the United States.

43. During the Class Period, Defendants' manipulation of the market for the sale of television advertising as described in this Complaint had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

44. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

45. Defendants' unlawful conduct had a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of television advertising, the prices of television advertising would be and would have been determined by a competitive, efficient market.

## FACTUAL ALLEGATIONS

**A.     The Television Broadcasting Market**

46.     The television landscape in the United States is made up of parent companies who own dozens of local TV stations that carry programming distributed through their broadcast platform, consisting of programming provided by third-party networks and syndicators, local news, their own networks, and other original programming.

47.     The industry enjoys significant market concentration. Due to a wave of consolidations and station purchases over the last decade, the largest broadcast media owners have grown considerably larger. In 2016, the five largest companies in local television were Sinclair, Nexstar, Gray, Tegna, and Tribune. These companies owned, operated, or serviced 443 stations, a 147% increase from the number of local stations owned, operated, and serviced in 2004.

48.     According to their websites, Sinclair owns 192 television stations in 88 U.S. markets, and Tribune owns or operates 42 television stations, making it the largest independent station group in the United States.

49.     Commercial advertising is a primary source of revenue for broadcasting companies, including Defendants. However, in recent years, broadcasting companies have experienced significant slowing of growth in their advertising revenues as consumers' media preferences have shifted towards digital ads.

50.     Facing increased competition from internet and other advertising, the following chart depicts the slowing growth of television advertising spending in the United States since 2012. Notably, the chart depicts a trend of decreased advertising spending beginning in 2016 and predicts that such spending will continue to decrease over the next few years:



51.     To remain profitable as ad spending continues to decrease, television broadcasting companies have been forced to attempt to grow their customer bases through mergers and acquisitions to achieve economies of scale, thereby increasing market concentration.

**B.      Defendants and Their Co-Conspirators Colluded to Fix Television Advertising Prices**

52.     Defendants had the motive and opportunities to conspire with each other.

53.     U.S. television advertising sales fell 7.9 percent last year, the steepest drop outside of a recession in at least 20 years. According to data from MagnaGlobal, a resource that develops investment strategies for industry heads, there is no sign of a pickup in 2018, excluding cyclical events like the Olympics and midterm elections.

54.     The decline in television viewership is accelerating as online rivals such as Facebook and Google have increased their investments in the online video advertising market, capturing almost

every new advertising dollar entering the marketplace. Almost half of the growth in video ad spending during the next five years will go to digital platforms, including mobile video, online video and out-of-home video, according to a new study on advanced television advertising published last week by BIA/Kelsey industry analysts.

55.     According to Sinclair's most recent 10-K, a primary source of revenue for television stations is "the sale of commercial inventory on . . . television stations to . . . advertising customers." Sinclair specifically admits that its "operating results depend on the amount of advertising revenue [it] generate[s]."

56.     Faced with increasing competition for advertising dollars, which remain crucial to broadcast television owners' financial success, Defendants had reason and motivation to conspire to artificially raise the prices of television advertising through price-fixing.

57.     Defendants and their co-conspirators not only had the motive to collude on television advertising prices, as described above, but they also had numerous opportunities to conspire to with each other under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy.

58.     In particular, almost 300 full-power television stations changed hands in 2013 and many of these deals resulted in stations in the same market being separately owned on paper but operated jointly, a practice that has grown exponentially in recent years. As of 2014, joint service agreements of one kind or another existed between Defendants and other TV station owners in at least 94 markets, almost half of the 210 local television markets nationwide, and up from 55 in 2011. Specifically, Sinclair admits that "[c]ertain of [its] stations have entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services . . . sales services[,] and other non-programming operating services.



**Drop in National TV Ads Forecast**
The ad-buying firm Magna said that national TV ad sales fell 2.2 percent in 2017. It predicted that they would decline at least 2 percent each year through 2022.

The forecast excludes local TV and ads from cyclical events like the Olympics and U.S. presidential campaigns.

By The New York Times | Source: Magna

59. Additionally, Defendants and their co-conspirators had numerous opportunities to conspire through industry associations.

60. For example, the TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry." TVB is designed to bring together and encourage information sharing among employees of broadcast television companies like Defendants, especially advertising sales representatives. TVB is especially dedicated to helping broadcast television companies promote and improve their advertising sales efforts. Sinclair and Tribune, among other media companies, are members of TVB. TVB events and initiatives provided Defendants with the opportunity to collude and to act in furtherance of their conspiracy.

61. To this end, on November 20, 2017, a group of broadcast television companies, including Sinclair and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces

15

to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners."

62.     Sinclair and Tribune, among others, had been working together to launch this initiative since early 2017, which provided them additional opportunity to share competitively sensitive information related to advertising sales and pricing.

63.     Sinclair's President and CEO, Chris Ripley, was quoted as stating that Sinclair and the other broadcast television companies, including Tribune, had a "shared commitment to **_working together_**" to promote and grow their advertising sales and corresponding revenues and profits. Similarly, Tribune's President and CEO, Larry Wert, stated that the broadcast television companies, including Sinclair and Tribune, were "**_actively working together_**" to promote "the continued growth of our respective businesses."

64.     In other words, Sinclair, Tribune, and their co-conspirators openly worked together to develop information systems that would provide standardized data and forms that could be used to sell television advertising to potential advertisers and, in the process, shared information with each other, which was used to engage in unlawful price-fixing.

65.     Sinclair, Tribune, and other broadcast television companies are also members of the NAB, which describes itself as the "premier trade association for broadcasters." Sinclair's CEO, Chris Ripley, and Tribune's COO, Kathy Clements, both serve on the NAB Television Board of Directors. Representatives of Sinclair, Tribune, and other broadcast television companies also serve together on the NAB Television Technology Committee. NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

66.     Defendants, along with other broadcast television companies, are also members of the Media Rating Council ("MRC"). MRC boasts that one of the "[b]enefits of MRC [m]embership" is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars together."

67.     Sinclair's attempt to acquire Tribune, which has been ongoing for years (and was publicly announced in May 2017), also provided an additional opportunity for the companies to collude to artificially inflate prices for television advertising.

68.     In May 2017, Defendants publicly announced their plans for a corporate merger. Under the original merger plan, Sinclair and Tribune would jointly reach nearly three quarters of U.S. television households. The maps below depict the reach of Sinclair's broadcast television stations before and after the acquisition of Tribune under the original plan submitted to regulators.



Wary of the FCC's rejection of the deal, Defendants submitted a revised version of the merger plan to antitrust regulators. Under the revised plan Sinclair would acquire Tribune for $3.9 billion, forming a company that would own 215 broadcast television stations in 102 cities, reaching close to 60 percent of all U.S. television households.

69.     Analysts have called the proposed merger between Sinclair and Tribune, "a very transformative acquisition" that would create "a broadcaster with as close to a national footprint

17

as you can get." Indeed, Defendants jointly have extreme market penetration at over 80%, with Tribune currently reaching 43% of the nation's households and Sinclair reaching 38% of American homes.

70.     The FCC's National TV Ownership Rule, prohibits a single television broadcasting company from owning a collection of stations such that it reaches more than 39 percent of all U.S. television households. Therefore, the merger plan between the Defendants could only be accomplished by selling certain television stations to reduce the number of households reached.

71.     Sinclair's revised merger plan called for selling certain stations to friends and other parties with whom it has a business relationship, for significantly less than fair value, while still maintaining control of these stations. For example, Sinclair has agreed to sell to Fox Broadcasting Co., Standard Media Group LLC, Meredith Corp., Howard Stirk, and Cunningham Broadcasting Corp., among others. Although Sinclair will no longer own these stations after the sale, it intends to continue running the stations through an "options and services agreement" with the buyers, effectively allowing it to perform a run-around the FCC's National TV Ownership Rule.

72.     The FCC recently stated that it has "serious concerns" and "material questions" about the merger between Sinclair and Tribune and referred the matter to an administrative law judge to determine whether the proposed station sales were in fact "sham" transactions to skirt the FCC rules.

73.     Specifically, the FCC is concerned that Sinclair did not intend to actually relinquish control over television stations that it proposed to divest in order to comply with the National TV Ownership Rule, and that Sinclair was less than candid with the FCC. Indeed, the FCC suspected certain "'sidecar agreements' [ ] would allow Sinclair to retain control of stations without owning them." According to FCC Commissioner Michael O'Rielly, the vote to send the merger to an administrative law judge is a "'de facto merger death sentence.'"

74. Tribune and Sinclair have since both announced they have withdrawn from the merger agreement.

75. Yet, even without an approved merger, Defendants' conspiracy allowed them to jointly control advertisers' ability to reach over 80 percent of U.S. households and to use this control to stifle competition. From at least 2014 forward, Defendants used their combined reach to conspire to charge supracompetitive prices for television advertising in violation of federal antitrust laws.

**C.      The Television Advertising Market Was Ripe for Collusion**

76. A highly-concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

77. The market for television advertising was particularly susceptible to collusion during the Class Period because: (1) there are a limited number of television station owners selling television advertising as the industry has been rapidly consolidating; (2) the barriers to entry are extremely high; (3) the products are homogenous; (4) Defendants and their co-conspirators have a common motive to conspire—a desire to maintain and increase their profits; and (5) Defendants had ample opportunities to conspire with each other through industry associations and initiatives such as NAB, TVB, MRC, and TIP Initiative.

78. Defendants colluded with each other by sharing competitively sensitive information regarding advertising sales and pricing to artificially inflate prices for television advertising. Defendants engaged in the anticompetitive conduct described herein in order to charge supracompetitive prices without the risk of losing customers.

79. In a conspiracy that increases the price for consumers, market forces would typically attract new entrants seeking to exploit the pricing gap created by that conspiracy's supracompetitive pricing. But where, as here, there are high barriers to entry for an industry, new

broadcast television companies outside the conspiracy are less likely to enter the market.

80.     In the broadcast television industry, there are high barriers to entry due to high capital costs and a high degree of technical sophistication and relative scarcity of people with experience in those areas. Governmental policy, including regulatory or administrative practices may also restrict market access.

81.     The existing dominant broadcasters usually have long established relationships with viewers and advertisers. New entrants in the market would have to offer a better deal than the existing broadcasters in order to usurp any market share. Further, larger broadcasting companies have greater clout to negotiate programming deals with networks or syndicators. A newer entrant would thus have to invest significant capital and time in establishing itself before it could work with networks.

82.     Television broadcasting companies have discovered that they can only survive and thrive by growing ever larger, making it almost impossible for a new entrant to the market to effectively compete with Defendants.

     **D.**    **The DOJ Launches a Probe into Defendants' Collusion in the Television Advertising Market**

83.     As reported by *The Wall Street Journal* on July 26, 2018, the DOJ has launched an investigation into Defendants' and their co-conspirators' collusion in the market for the sale of television advertising in the United States.

84.     While conducting a review of the nearly $4 billion acquisition proposed by Sinclair and Tribune, the government discovered information that led it to investigate Defendants' conspiracy to artificially inflate advertising prices. Specifically, the DOJ is investigating whether Defendants "coordinated efforts when their ad sales teams communicated with each other about their performance" in order to artificially inflate television advertising prices in violation of federal antitrust laws.

85.     The Deputy Assistant Attorney General for Civil Antitrust, Barry Nigro, recently acknowledged that antitrust investigations often arise during the course of merger reviews. Mr. Nigro further noted that potential antitrust violations sometimes come to the DOJ's attention through document analyses performed in connection with such reviews.

86.     Indeed, when conducting a merger investigation pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, the DOJ or the Federal Trade Commission ("FTC") may issue "broad 'second requests' for documents and data" that "may reveal antitrust problems separate from the reported merger." This is the case here.

## THE RELEVANT MARKET

87.     Plaintiff disclaims the need to plead a relevant market for its antitrust claims because the price-fixing conspiracy alleged herein is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. The restraint of trade and anticompetitive conduct alleged herein directly inflated or maintained prices and restrained competition in the market for the sale of television advertising in the United States, constituting a *per se* violation of the Sherman Act, 15 U.S.C. § 1.

88.     In the alternative, Defendants' collusion is an unreasonable restraint of trade, which resulted in substantial anticompetitive effects in the market for the sale of television advertising in the United States in violation of the Sherman Act, 15 U.S.C. § 1 under a "quick look" or "rule of reason" mode of analysis.

89.     The relevant product and geographic market for purposes of this complaint is the market for the sale of television advertising in the United States.

## ANTITRUST INJURY

90.     Plaintiff and members of the Class purchased television advertising from one or more Defendants or their co-conspirators in the United States.

91. Sinclair and Tribune are horizontal competitors in the market for the sale of television advertising in the United States. Together, the media companies reach more than 80 percent of households in the United States.

92. Defendants and their co-conspirators participated as co-conspirators and performed acts in furtherance of the conspiracy alleged herein.

93. Defendants intended to restrain trade, and actually restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in artificial manipulation of the U.S. market for the sale of television advertising—including price-fixing—and their conduct injured competition and Plaintiff and members of the Class.

94. Defendants and their co-conspirators shared a conscious commitment to the common scheme designed to achieve the unlawful objective of inflating, fixing, stabilizing, and/or maintaining advertising rates.

95. Rather than competing on price as horizontal competitors typically would, Defendants colluded to artificially inflate, stabilize, fix, and/or maintain prices for television advertising, thereby increasing advertising prices relative to the but-for world in which Defendants competed on price.

96. As alleged herein, Defendants' collusion had the following effects on the U.S. market for the sale of television advertising and proximately caused injury to Plaintiff and members of the Class in the following ways, *inter alia*:

a. Defendants' unlawful anticompetitive conduct restrained price competition in the market for the sale of television advertising in the United States;

b. Purchasers of television advertising from one or more Defendants or their co-conspirators in the United States—including Plaintiff and members of the Class— paid fixed,

maintained, stabilized, and/or artificially inflated prices for television advertising that were above competitive levels; and

        c.     Purchasers of television advertising from one or more Defendants or their co-conspirators in the United States—including Plaintiff and members of the Class— have been deprived of the benefit of free and open competition on the basis of price in the market for the sale of television advertising.

        97.     Absent Defendants' and their co-conspirators' collusion, those purchasing television advertising would have transacted at competitive prices and reaped the benefits of competition.

        98.     As a direct, intended, foreseeable, and proximate result of Defendants' unlawful conspiracy and acts in furtherance of their conspiracy, Plaintiff and members of the Class have been injured in their business and property, in violation of the federal antitrust laws.

        99.     The injury to Plaintiff and members of the Class is the type the antitrust laws were designed to prevent and directly flows from Defendants' unlawful anticompetitive conduct.

        100.     There is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade.

        101.     Defendants are jointly and severally liable for the acts of their co-conspirators.

## FRAUDULENT CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS

        102.     Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the conspiracy and conduct alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Class were deceived and had no knowledge regarding Defendants' collusion to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising and could not reasonably discover the collusion.

103.    The very nature of Defendants' conspiracy was secret and self-concealing. Defendants engaged in market manipulation that could not be detected by Plaintiff and members of the Class.

104.    Plaintiff and members of the Class had no facts sufficient to place them on inquiry notice of the conspiracy alleged herein until July 26, 2018, when *The Wall Street Journal* published an article reporting that the DOJ was investigating collusion between Defendants and their co-conspirators to inflate prices in the market for the sale of television advertising.

105.    As alleged herein, Defendants' collusion to fix prices in the market for the sale of television advertising was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising, which Defendants fraudulently concealed.

106.    Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

107.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including their collusion to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising.

108.    Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

109.    For these reasons, all applicable statutes of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment and Defendants are estopped from

relying on any statutes of limitations in defense of this action.

## COUNT I
## VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1

110.    Plaintiff incorporates by reference and re-alleges each preceding paragraph as though fully set forth herein.

111.    As alleged herein, Defendants combined, conspired, and agreed to stifle competition in the market for the sale of television advertising in the United States. Specifically, Defendants and their co-conspirators colluded to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising.

112.    Defendants' and their co-conspirators' price-fixing conspiracy alleged herein is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. The restraint of trade and anticompetitive conduct alleged herein directly inflated or maintained prices and restrained competition in the market for the sale of television advertising in the United States, constituting a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

113.    Defendants' combination, conspiracy, and/or agreement unreasonably restrained trade in violation of the federal antitrust laws.

114.    Alternatively, the anticompetitive combination, conspiracy, and/or agreement alleged herein resulted in substantial anticompetitive effects in the market for the sale of television advertising in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

115.    Defendants intended to restrain trade and actually restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants shared a conscious commitment to the common scheme designed to achieve the unlawful objective of fixing, maintaining, stabilizing, and/or artificially inflating television advertising prices and stifling competition in the market for the sale of television advertising.

116.    The anticompetitive combination, conspiracy, and/or agreement alleged herein unreasonably restrained trade, and there is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade. Any alleged procompetitive benefit or business justification is pretextual and/or could have been achieved through less restrictive means.

117.    The anticompetitive combination, conspiracy, and/or agreement alleged herein occurred within the flow of and substantially affected interstate commerce.

118.    As a direct and proximate result of Defendants' anticompetitive scheme and concrete acts in furtherance of that scheme, Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

119.    Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

120.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff and Class members are entitled to treble damages, costs, and attorneys' fees for the violations of the Sherman Act alleged herein.

**COUNT II**
**INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1**

121.    Plaintiff incorporates by reference and re-alleges each preceding paragraph as though fully set forth herein.

122.    Plaintiff asserts this count on behalf of itself and the members of the nationwide Class.

123.    As alleged herein, Defendants and their co-conspirators combined, conspired, and

agreed to stifle competition and fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising in the United States. This combination, conspiracy, and/or agreement unreasonably restrained trade in violation of the federal antitrust laws.

124. Specifically, the anticompetitive combination, conspiracy, and/or agreement alleged herein is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Alternatively, the anticompetitive combination, conspiracy, and/or agreement alleged herein resulted in substantial anticompetitive effects in the market for the sale of television advertising in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

125. Defendants intended to restrain trade and actually restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants shared a conscious commitment to the common scheme designed to achieve the unlawful objective of fixing, maintaining, stabilizing and/or artificially inflating television advertising prices and stifling competition in the market for the sale of television advertising.

126. The anticompetitive combination, conspiracy, and/or agreement alleged herein unreasonably restrained trade, and there is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade. Any alleged procompetitive benefit or business justification is pretextual and/or could have been achieved through less restrictive means.

127. The anticompetitive combination, conspiracy, and/or agreement alleged herein occurred within the flow of and substantially affected interstate commerce.

128. As a direct and proximate result of Defendants' anticompetitive scheme and concrete acts in furtherance of that scheme, Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by reason of Defendants' violation

27

of Section 1 of the Sherman Act, 15 U.S.C. § 1, and are entitled to injunctive relief, costs, and attorneys' fees pursuant to the Clayton Act, 15 U.S.C. § 26.

129.    Unless enjoined, Defendants' anticompetitive combination, conspiracy, and/or agreement will continue.

130.    Plaintiff's and the Class members' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

131.    Plaintiff and members of the Class seek an injunction against Defendants, preventing and restraining the Sherman Act violations alleged herein, costs, and attorneys' fees. *See* 15 U.S.C. § 26.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

a.    Certify this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

b.    Declare Defendants' conduct alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.    Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees and other officers, directors, agents and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other

contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d.      Find Defendants jointly and severally liable for the acts of their co-conspirators and for the damages incurred by Plaintiff and the Class;

e.      Award actual damages, costs, disgorgement, and/or treble damages under applicable law;

f.      Award Plaintiff and members of the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 (a);

g.      Require Defendants to pay both pre- and post-judgment interest on any amounts awarded;

h.      Award Plaintiff costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

i.      Direct any such further relief that the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

_____/s/_____

John R. Solter, Jr. (Bar No. 27483)
jsolter@azraelfranz.com
Azrael, Franz, Schwab & Lipowitz, LLC
101 E. Chesapeake Avenue, 5th Floor
Baltimore, Maryland 21286
410-821-6800
*Attorneys for Plaintiff*

Eugene A. Spector
(*Pro Hac Vice* forthcoming*)*
William G. Caldes
(*Pro Hac Vice* forthcoming*)*
**SPECTOR ROSEMAN & KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
espector@srkattorneys.com
bcaldes@srkattorneys.com

David P. McLafferty
(*Pro Hac Vice* forthcoming*)*
**MCLAFFERTY LAW FIRM, P.C.**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000
Fax: (610) 940-4007
dmclafferty@mclaffertylaw.com
*Attorneys for Plaintiff(s)*